**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KERRY-X [MARSHALL],** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:12-0351** |
| **v.** | : | **(JUDGE MANNION)** |
| **PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al.,** | : | |
| | : | |
| **Defendants** | : | |
| | : | |

**MEMORANDUM[1]**

## I.    Background

On January 24, 2012, Plaintiff, Kerry-X Marshall, an inmate currently

confined at the Rockview State Correctional Institution, Bellefonte,

Pennsylvania, filed the above captioned, *pro se* action, on behalf of himself

and four other individuals, in the United States District Court for the Western

District of Pennsylvania, at Civil No. 2:12-cv-00082. (See Doc. 7, complaint).

James Jihad Butler, Shawn Mustafa Saunders, James Shakoor Townsend,

and Melvin Ali Lindsey are the four other named Plaintiffs. Plaintiff alleges a

---

[1] For the convenience of the reader of this document in electronic format, hyperlinks to the court's record and to authority cited have been inserted. No endorsement of any provider of electronic resources is intended by the court's practice of using hyperlinks.

denial of the First Amendment right to one's freedom to exercise religion.

Specifically, the complaint states that:

> This civil action concerns a Federal Constitutional/Federal and State statutory challenge of a PDOC-Religious Policy, which all SCIs are subject to follow within the PDOC system (namely, PDOC, SCIM, SCIF, and SCIR), that violates Plaintiffs' civil rights by: (1) prevents Plaintiffs' free exercise of NOI, (2) establishment of Sunni Islam sect as the PDOC's favored Islamic group to be followed over Plaintiffs', (3) prevents Plaintiffs from observing separate NOI religious services, while allowing separate Christian religious services, (4) compels NOI and Sunni Islam groups to merge and observe combined Islamic services contrary to Plaintiffs' religious beliefs, while not compelling the four Christian groups to do the same, (5) coercively pressures Plaintiff's to convert to and follow Sunni Islam, while not compelling the Christian sects' adherents to convert to and follow the larger Protestant group, (6) prevents the Plaintiffs from purchasing and wearing the 'NOI Crown' (Islamic Fez headcap), while allowing adherents of other religions to wear their religions' head caps, and (7) de facto 'banned' Plaintiffs' NOI faith and required practices.

Id.

On February 1, 2012, Magistrate Judge Kelly issued a Report and Recommendation, recommending, that the four parties who did not sign the Complaint be dismissed, that any putative class action claims be dismissed, and the remaining claims be transferred to the United States District Court for the Middle District of Pennsylvania. (Doc. 2, Report and Recommendation). The Magistrate Judge found that the only remaining claims were Plaintiff Marshall's individual claims that while housed in SCI-Mahanoy, he was denied

2

his religious rights. (Doc. 2, at 5).

By Memorandum Order dated February 17, 2012, Judge Bissoon adopted the Report and Recommendations in full, dismissed the four non-signatory Plaintiffs, and transferred the action to this Court. (Doc. 6, Order).

On May 15, 2012, this Court, recognizing Judge Bissoon's Memorandum Order, directed the Clerk of Court to re-caption the above complaint to reflect the name of the sole Plaintiff, Marshall, in this matter. (Doc. 21, Order.) Additionally, the Court denied Plaintiff's motion for a preliminary injunction, finding that Plaintiff did not have standing to bring claims, or requests for relief, on behalf of other inmates, and that Marshall's transfer from SCI-Mahanoy mooted his claim for injunctive relief involving that facility. Id. Finally, the Court granted Marshall's motion for leave to proceed in forma pauperis, and directed the United States Marshal to serve the Complaint upon Defendants. Id. The United States Marshal Service served the Complaint on May 17, 2012. (See Doc. 21, Order).

By Memorandum and Order dated January 22, 2014, the Court denied Defendants' motion for summary judgment, denied Plaintiff's motion for leave to file an amended complaint, and granted Plaintiff's motion to compel,

directing Defendants to respond to Plaintiff's outstanding discovery requests on, or before, February 14, 2014. (Docs. 105, 106, Memorandum and Order). On April 17, 2014, a Scheduling Order was issued, directing that any dispositive motions be filed on, or before, May 30, 2014. (Doc. 107, Order).

Presently before the Court are the parties' cross motions for summary judgment. (Docs. 118, 121). The motions are ripe for disposition, and for the reasons set forth below, Plaintiff's motion for summary judgment will be denied and Defendants' motion for summary judgment will be granted.

Also before the Court are Plaintiff's motion for enlargement of time to file dispositve motions, motion to file an amended complaint, motion to compel discovery, motion for leave to take videotape deposition of Defendants and Plaintiff's motion for a court order to compel SCI-Rockview to allow Plaintiff to mail his brief in response to Defendants' brief in opposition to Plaintiff's motion for summary judgment. (Docs. 109, 110, 113, 119, 135).

Based on the Court's resolution of the parties' cross motions for summary judgment, *infra*, Plaintiff's motion for enlargement of time to file dispositive motions, motion to take videotape depositions, and motion for an order to file a sur-reply, will be dismissed as moot. Plaintiff's motion to compel will be denied, as Defendants have responded to all of Plaintiff's discovery

requests. (See Doc. 112, Defendants' brief in opposition to Plaintiff's motion to compel). Plaintiff's motion for leave to file an amended complaint will be denied for the reasons set forth in this Court's January 22, 2014 Memorandum and Order.

## II.   **Standard of Review**

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson,

477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant]

6

will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending. Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir.2008). As stated by the Third Circuit, " '[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.' " Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968)).

## III.     Statement of Facts

From the pleadings, declarations, and exhibits submitted therewith, the following pertinent facts can be ascertained from the record as undisputed.

The DOC policy for religious activities is set forth in Department of Corrections Administrative Directive 819 ("DC-ADM 819"). (See Doc. 125 at

132-152, DC-ADM 819, Religious Activities Procedures Manual, Section 4 - Religious Accommodations). The DOC and SCI-Mahanoy are committed to providing inmates with the opportunity to practice the basic tenets of their faith through religious programs and services, while guarding against the misuse of inmates claiming religious beliefs as a means of obtaining special privileges or breaching security. (Doc. 125 at 7, Defendants' statement of material facts). Worship services for major faith groups, which represent the whole body of a particular faith group, such as Catholics, Jehovah's Witnesses, Jewish, Muslim, Native American and Protestants are provided in all correctional institutions. (Doc. 125 at 34, Affidavit of Reverend Ulli Klemm). Religious leaders, including but not limited to chaplains, imams and rabbis are approved by the DOC in order to assure that worship is in accordance with the tenets of the faith groups and to guard against potential security concerns. Id. The DOC allows for diversity of worship, and reasonable accommodations are made for inmates consistent with the order, safety and security of the correctional facility, prison staff and inmates, including faith groups that fall outside of the majority groups. Id.

For instance, the term "broad Islamic faith" refers to those religious traditions, which contain the most basic elements of the Islamic tradition and

8

is not an Islamic denomination. (Doc. 125 at 33-34, Klemm Affidavit). The term "broad Islamic faith" does not imply that all individuals who practice the Islamic faith or an offshoot of that faith, possess and profess identical faith teachings and perspective, nor does it mean that inmates who identify with the broad Islamic faith have the same faith teaching similarities in common. Id. Just as there is a "broad Islamic Faith" there is a "broad Jewish faith" for which Jewish inmates are provided religious accommodations (Ultra-Orthodox, Orthodox, Conservative, Reform, etc…), there is a "broad Protestant faith" (Fundamentalists, Episcopalian, Mennonite, Pentecostal, Baptist), and a broad Native American tradition (Lakota, Cherokee, Apache, Taino) under one "faith umbrella". Id.

SCI-Mahanoy does not, and has not ever, provided separate congregational services for those who adhere to Muhammad's Temple of Islam (MTOI) and Nation of Islam (NOI),[2] from those provided to Sunni Orthodox Muslims. (Doc. 125 at 36, Klemm Affidavit). Taking into account the

---

[2]Although Plaintiff's Religious Accommodation Request and his Grievance were based on separate MTOI services, his complaint references both MTOI and NOI.  Since it is clear from the record that SCI-Mahanoy does not now, nor has it ever, offered separate services for either MTOI or NOI, it is not necessary to delineate the difference between MTOI adherents and NOI adherents.

cost that would be incurred, as well as security concerns of guards, inmates and prison resources generally, at this time it is not practical to provide separate MTOI services at SCI-Mahanoy. Id.

Of the twenty-seven State Correctional Institutions, there are only a few institutions in the Department which have a long-standing tradition of accommodating inmates who identify with the NOI with a regular group meeting time. (Doc. 125-1 at 44, Klemm's response to Plaintiff's First Set of Interrogatories). These accommodations were made prior to the existence of the Religious Accommodation Review Committee, which began in 2011, and consist of the following:

> Prior to 1989, SCI-Graterford has accommodated a weekly meeting for NOI inmates, led by volunteers or supervised by staff. The group has had between 8-20 participants.
>
> Prior to 1990, SCI-Huntingdon has accommodated a weekly NOI tape-viewing meeting for NOI inmates.
>
> Since 1997, SCI-Albion has accommodated a weekly meeting for NOI inmates, led by contracted chaplain Minister Michael Anderson. NOI's fast during the month of Ramadan with the larger Muslim population and participate in two Eid Feasts with the rest of the Muslim population.
>
> Since 1999, SCI-Greene has accommodated a weekly meeting for NOI inmates, led by contracted chaplain Minister Michael Anderson. NOI's fast during the month of Ramadan with the larger Muslim population and participate in two Eid Feasts with the rest of the Muslim population.

> In 2010, at SCI-Rockview, inmates were allowed to watch NOI video's every other week. This was an allowance made by Secretary J. Beard and this accommodation did not come through the Religious Accommodation Review Committee.

Id. The Bureau of Treatment and Services (BTS) and the Religious Accommodation Review Committee (RARC) have not yet expanded the number of facilities in which Nation of Islam inmates are accommodated with a separate group meeting time, due to security and budgetary limitations, available resources, the impact of accommodating requests on the normal operation of the prison, as well as time and space constraints. Id.

Despite the fact that MTOI adherents are not provided with separate congregational services from Orthodox Sunni Muslims, MTOI adherents are permitted spiritual growth opportunities, month long fast and food accommodations, as well as religious books, CD's and DVD's, which may be donated to the institution provided they meet the standards outlined in the DOC religious accommodations policy. Id. Plaintiff was able to pray and conduct religious rituals in his cell, correspond with and have priests, ministers, or religious advisors visit him at the prison, possess religious books and materials, and other devotional items such that are consistent with prison security policies. Id.

11

Inmates seeking accommodations for a particular faith are directed to express their concerns to the Religious Accommodation Review Committee (RARC) via an Inmate Religious Accommodation Request Form ("RAR"). (Doc. 125 at 140-143, DC-ADM 819, Religious Activities Procedures Manual, Section 4 - Religious Accommodations). In accordance with DC-819, inmates must first submit an RAR to the Facility Chaplain Program Director ("FCPD"). Id. The evaluation of all RARs is the same, no matter to what religious group the inmate belongs. Id. The inmate is encouraged to obtain written information from his outside faith group, including any publications that describe the goals, beliefs and practices of the group and supply this information to the FCPD for review. Staff at the institution also evaluates the RAR and, upon completion of the institutions evaluation of a request, the request is forwarded to the RARC. Id. The RARC then reviews the request and makes a recommendation to the Regional Deputy Secretary. Id. Upon completion of review, the RARC notifies the Facility Manager and the FCPD, who then notifies the inmate of the outcome of the request. Id. If an inmate is informed that the request will not be accommodated, he may file a grievance in accordance with the DOC's Grievances policy, DC-ADM 804. (Doc. 125 at 33, Klemm Affidavit)

The Department consults with Muslim Imams throughout the Department as well as Islamic scholars outside the Department when ascertaining how best to accommodate Muslim inmates with their requests. Id. Currently, two full-time Imams sit on the Religious Accommodations Review Committee and provide guidance to the Department on Islamic concerns. Id.

On February 2, 2009, while housed at SCI-Mahanoy, Plaintiff filed a Religious Accommodation Request Form, stating that as an adherent to Muhammad's Temple of Israel ("MTOI"), he request MTOI services be established, including Ramadhan services in the month of December, and services for Eid-Fitr and Eid-al-Adha; Ju'mah prayer services; religious study classes; Islamic holy books; cassette tapes; DVD's and DVD player; Islamic bow ties, crowns, incense, oils, prayer rugs and bean pies, as well as Islamic dietary meals, and a means of generating Islamic treasury/funds. (Doc. 125-1 at 66, Inmate Religious Accommodation Request Form).

On March 9, 2009, Marshall's Religious Accommodation Request was evaluated by Rev. Waddell, and the following was determined:

> I have spoken to this Inmate regarding this request. I have advised him to attend the Muslim services, to feel free to make an appointment with the Iman or any of the chaplains for spiritual care, to purchase approved religious resources, utilize religious

13

diet accommodations, and to continue to practice his faith in his cell. He has been assured that his religious beliefs are respected. This request is denied as it has previously been answered by the RAC committee with a decision issued stating, "Separate services (including sacred items used for group gatherings), observations and a separate fast for NOI inmates are currently denied as services and spiritual growth opportunities, including a month-long fast and food accommodations, are already provided for inmates who identify with the broad Islamic faith at this institution. Within security and budgetary limitations and in light of available resources, the PA DOC seeks to accommodate the sincerely held religious beliefs of all inmates provided they do not interfere with the normal operations of the prison. Time and space constraints at all PA DOC institutions unfortunately limit the number of different religious services the PA DOC can realistically provide to inmates. If inmate wishes to again apply for services at some future date, the request for religious accommodations will be reviewed based on the demand for services and available resources at that time. Religious books, CD's and DVD's may be donated to the Chaplain's Office provided they meet content standards as outlined in DC-ADM 803."

(Doc. 125-1 at 67, Evaluations of Requests for Religious Accommodation).

In a response dated August 4, 2009, Regional Deputy Secretary Shirley Moore-Smeal concurred with the recommendation. (Doc. 125-1 at 69, Response Letter).

By letter dated August 13, 2009, Superintendent Kerestes was informed of the Deputy Secretary's affirmance of the denial of Marshall's Religious Accommodation Request, and was asked to notify Marshall of the decision, as well as all appropriate staff. (Doc. 125-1 at 70, Aug. 13, 2009 Letter).

14

In response to an inquiry by Marshall, on December 2, 2009, Rev. Klemm wrote to Marshall, informing him of the August 13, 2009 notice to the institution, denying Marshall's Religious Accommodation Request. (Doc. 125-1 at 72, Dec. 2, 2009 Letter).

On December 10, 2009, Marshall submitted an Inmate's Request to Staff Member requesting a copy of the Religious Accommodation Approval Letter that was sent to the institution on August 13, 2009. (Doc. 125-1 at 73, Inmate's Request to Staff Member). Plaintiff's request was received on December 14, 2015 and he was instructed to see staff on December 15, 2009. Id.

On December 16, 2009, Marshall filed Grievance No. 300593, claiming that he is being denied MTOI services at SCI-Mahanoy "based on a religious discriminatory prison policy, DC-ADM 819". (Doc. 125-1 at 8, Official Inmate Grievance). For relief, Plaintiff requested damages, as well as that "DC-ADM 819 policy be changed to allow separate MTOI services from the Orthodox Sunni Muslim services". Id.

By response dated January 4, 2010, Grievance Officer Mason denied Grievance No. 300593, finding the following:

> In your grievance you claim that you are being discriminated against by being denied separate "Muhammad's Temple of Islam"

15

> religious services. You request that DC-ADM 819 policy be changed and that these services be established at SCI-Mahanoy. You further request monetary relief for your "pain and suffering."
>
> Be advised that your religious accommodation request was denied in accordance with policy. I do not have the authority to change policy nor will we deviate from it. I find no evidence of intentional religious discrimination as you allege.
>
> Based on the information, your grievance and request for relief is denied.

(Doc. 125-1 at 9, Official Inmate Grievance Initial Review Response).

Marshall appealed the denial of his grievance, and by response dated

January 14, 2010, Superintendent Kerestes denied Marshall's appeal. (Doc.

125-1 at 10, Response to Official Inmate Grievance).

On January 20, 2010, Marshall filed a final appeal to the Secretary's

Office of Inmate Grievances & Appeals. (Doc. 125-1 at 11, Final Appeal).

On March 12, 2010, Chief Grievance Officer Dorina Varner, upheld the

Superintendent's denial, finding the following:

> You state that you were denied separate Muhammad's Temple of Islam (MTOI) Services at SCI-Mahanoy based on a religious discriminatory prison policy. Your concerns have been investigated. Records reflect that you submitted a Religious Accommodations Request requesting such services. Your request was reviewed and it was decided that separate services/classes for MTOI inmates are currently denied as services and spiritual growth opportunities are already provided for inmates who identify with the broad Islamic faith. Therefore, your grievance appeal to this office is denied. There is no evidence to suggest that SCI-

Mahanoy is discriminating against your religion.

(Doc. 125-1 at 12, Final Appeal Decision).

Plaintiff's Grievance No. 300593, filed December 16, 2009, is the only grievance Plaintiff filed to final review, while housed at SCI-Mahanoy, that concerns the denial of religious accommodations requests for Muslims. (Doc. 125-1 at 5 Affidavit of Dorina Varner, Chief Grievance Coordinator).


## IV.      Discussion

### A.      The Prison Litigation Reform Act

Section 1997e(a) of title 42 U.S.C. provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). A prisoner must exhaust all available administrative remedies before initiating a federal lawsuit. Booth v. Churner, 532 U.S. 731, 739 (2001). Failure to exhaust available administrative

17

remedies is an affirmative defense. Ray v. Kertes, 285 F.3d 287 (3d Cir. 2002). As such, the failure to exhaust available administrative remedies must be pleaded and proven by the Defendants. Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002).

The Pennsylvania Department of Corrections' administrative remedies for inmate grievances are provided for in Department of Corrections Administrative Directive 804 ("DC-ADM 804"). This policy establishes the Consolidated Inmate Grievance Review System, through which inmates can seek to resolve issues relating to their incarceration. The first step in the inmate grievance process is initial review. Id. Grievances must be submitted for initial review within 15 working days after the event upon which the grievance is based. Id. After initial review, the inmate may appeal to the superintendent of their institution. Id. Upon completion of the initial review and the appeal from the initial review, an inmate may seek final review. Id.

The undisputed record reveals that Marshall exhausted his administrative remedies to final review, only with respect to the denial of separate MTOI services at SCI-Mahanoy. Thus, any other requested accommodations, outside of separate MTOI services, are unexhausted and not before this Court.

18

**B.     Religious Land Use and Institutionalized Persons Act of 2000**

Section 3 of Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means." 42 U.S.C. §2000cc-1(a)(1)-(2). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §2000cc-5(7)(A); see also Cutter v. Wilkinson, 544 U.S. 709, 715 (2005).

Although Congress intended that RLUIPA be construed "in favor of broad protection of religious exercise," see 42 U.S.C. §2000cc-3(g), Congress also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" Cutter, 544 U.S. at 723. Congress indicated that in the event an inmate's request for religious accommodation would "become excessive,

19

impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." Id. at 726; see also Holt v. Hobbs ---- U.S. ----, 135 S.Ct. 853, (2015)(recognizing the plaintiff has the burden to show a sincerely held religious belief and that governmental action substantially burdened that belief).

Under RLUIPA, the plaintiff must show that his religious exercise has been burdened substantially by the challenged conduct. Washington v. Klem, 497 F.3d 272, 277-78 (3d Cir. 2007). The Third Circuit Court of Appeals has found that for the purposes of RLUIPA, a substantial burden exists where: "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." Id. at 280.

If the plaintiff shows that prison administrators' action or inaction has imposed a substantial burden on the exercise of his religion, the prison administrator must establish that the challenged conduct furthers a compelling governmental interest and that it is the least restrictive means of furthering

that interest. Id. at 283. Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723. "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' Rather, due deference will be afforded to those explanations that sufficiently 'take[ ] into account any institutional need to maintain good order, security, and discipline'." Holt, 135 S.Ct. at 866.

Initially, the Court notes that Marshall cannot recover compensatory or punitive damages against Defendants in either their individual or official capacities under RLUIPA. In 2012, in the matter of Sharp v. Johnson, 669 F.3d 144 (3d Cir. 2012), in considering this very issue, the United States Court of Appeals for the Third Circuit stated that "the Courts of Appeals for the Fourth, Fifth, Seventh and Eleventh Circuits—the only circuits we are aware of that have addressed this issue in precedential opinions—have rejected arguments similar to Sharp's and held that RLUIPA does not permit actions against government employees in their individual capacities. See, e.g., Nelson v. Miller, 570 F.3d 868, 886–89 (7th Cir. 2009); Rendelman v. Rouse, 569

F.3d 182, 186–89 (4th Cir. 2009); Sossamon v. Lone Star State of Texas, 560 F.3d 316, 327–29 (5th Cir.2009); Smith v. Allen, 502 F.3d 1255, 1271–75 (11th Cir. 2007), abrogated on other grounds, Sossamon v. Texas, ––– U.S. –––, 131 S.Ct. 1651, 1654, 179 L.Ed.2d 700 (2011) (abrogating Smith as to the claim against government employees in their official capacities)." Sharp, 669 F.3d at 153-54. The Third Circuit joined those circuits in concluding that RLUIPA does not permit an action against defendants in their individual capacities. Id. at 155.

Moreover, Marshall cannot recover damages against the Defendants in their official capacities as they are barred by the Eleventh Amendment. The Eleventh Amendment bars money damages sought against a state official acting in his or her official capacity absent a valid abrogation by Congress or consent of the State. Kentucky v. Graham, 473 U.S. 159, 169 (1985) (holding that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court."). Congress did not validly abrogate or purport to abrogate the States' sovereign immunity against damages claims under RLUIPA, and the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. Scott v. Beard, 2007 WL 3194039, at *1 (3d Cir. 2007) (finding that the RLUIPA claim

22

for money damages against a Pennsylvania state official in his official capacity is barred by the Eleventh Amendment because it is essentially a claim against the state itself.) Defendants are entitled to summary judgment on the RLUIPA claim lodged against defendants in their official capacities.

To the extent that Marshall seeks injunctive and declaratory relief on his RLUIPA, such claims are moot based on the transfer of Marshall from SCI-Mahanoy to SCI-Rockview. An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims. Abdul-Akbar v. Watson, 4 F.3d 195, 197 (3d Cir. 1993) (finding that former inmate's claim that the prison library's legal resources were constitutionally inadequate was moot; plaintiff was released five months before trial, because "past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding equitable relief if unaccompanied by continuing, present adverse effects." Rosenberg v. Meese, 622 F. Supp. 1451, 1462 (S.D.N.Y. 1985). Furthermore, "[a]bsent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred." Wahl v. McIver, 773 F.2d 1169, 1173 (11th Cir. 1985) (citation omitted); see also, Carter v. Thompson, 808 F. Supp. 1548, 1555 (M.D. Fla. 1992); see also, Pruden v.

23

Schuylkill Cnty Prison Med. Staff, Civil No. 3:CV-07-006, 2007 WL 465522 *1 (M.D. Pa. Feb. 6, 2007). The RLUIPA claims for equitable and declaratory relief were rendered moot upon Marshall's transfer from SCI-Mahanoy. Consequently, Defendants are entitled to an entry of summary judgment.

Notably, even if Marshall were able to overcome each of these obstacles, he would still not be entitled to relief. It is clear from the record that Plaintiff has failed to demonstrate that the denial of his request for separate congregational services (or the denial of any of his requested religious accommodations) has substantially burdened his ability to exercise his religion. As is undisputed in the record, there were accommodations made which provided him with sufficient opportunity to adhere to his beliefs and practice his religion while housed at SCI-Mahanoy. Plaintiff was able to pray and conduct religious rituals in his cell, correspond with and have religious advisors visit him, possess religious books and materials, and other devotional items consistent with prison security policies, along with the opportunity for months long fasts. Moreover, there is no evidence that the failure to accommodate Plaintiff pressured him to substantially modify his behavior or to violate his beliefs. The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to

24

overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). Marshall has failed to meet this burden in that he has failed to create a genuine issue of fact as to how attending congregational services with Orthodox Sunni Muslims, along with the opportunity for months long fasts, food accommodations, religious CD's and DVD's has substantially burdened the exercise of his religion, or pressured him to modify his behavior and violate his beliefs.

Other courts considering this question have concluded that corrections systems are not required to provide separate Jumu'ah services for NOI or other Muslim sects. In Muhammad v. City of New York Department of Corrs., 904 F.Supp. 161 (S.D.N.Y. 1995), the district court recognized the differences between NOI and orthodox Islam, but concluded that "generic Muslim services provide comfort and solace to NOI members without pressuring such members to commit acts forbidden by their religion or preventing them from engaging in conduct or having a religious experience mandated by their faith." Id. at 191. The district court found that the plaintiff had "not shown that he cannot accomplish the mandates of his faith through the means that the

defendants do provide in his prison or that the absence of NOI congregate religious services has substantially burdened the exercise of his religious rights." Id.

In Davis v. Alameida, 2009 WL 890723 (C.D.Cal. 2009), the district court found no RLUIPA violation when an inmate's request for a separate NOI service was denied. The court concluded that the inmate "failed to show that his ability to pursue his NOI beliefs w[as] burdened by the failure to provide chapel time specific to the NOI followers." 2009 WL 890723 at *5. The denial of separate Jumu'ah service to NOI inmates in Jones v. Shabazz, No. H–06–119, 2007 WL 2873042 (S.D.Tex. Sept.28, 2007) was not found to violate RLUIPA where generic services "structured for all Muslim inmates, not exclusively for any sub-group" were offered. Id. at *19.

The Sixth Circuit, in Johnson v. Baker, 67 F.3d 299 (6th Cir.1995) [Table] found the Religious Freedom Restoration Act (analyzed similarly to RLUIPA under a strict scrutiny standard) was not violated by the denial of separate religious services for NOI inmates. It was determined by the Sixth Circuit that inmate Johnson had "no proscriptions placed on his beliefs or the practices of his religion, but is simply deprived of a special time and place to observe his beliefs **exclusively** with others who profess the same faith."

26

Johnson v. Baker, 67 F.3d at *4 (emphasis in original).

### C.    **First Amendment Exercise of Religion**

The First Amendment offers protection for a wide variety of expressive activities. See U.S. CONST. amend I. These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. See Turner v. Safley, 482 U.S. 78, 89 (1987). Although prisoners must be afforded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment, Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972), imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment's right to the free exercise of religion. O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987). It is well-established that only those beliefs which are (1) sincerely held, and (2) religious in nature are entitled to constitutional protection. Wisconsin v. Yoder, 406 U.S. 205, 215-19 (1972); Dehart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000); Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981) (describing three indicia of religion (1) an attempt to address "fundamental and ultimate questions" involving "deep and imponderable matters"; (2) a comprehensive belief system; and (3) the

presence of formal and external signs like clergy and observance of holidays.). It is undisputed that Marshall's sincerely held religious beliefs are entitled to Constitutional protection.

Whether an inmate's free exercise of religion has been impermissibly burdened is governed by the four-part test set forth by the Supreme Court in Turner, 482 U.S. 78. Specifically, Turner instructs courts to weigh four factors when applying this standard: (1) whether the regulation or practice bears a "valid, rational connection" to a legitimate and neutral governmental objective; (2) whether prisoners have alternative ways of exercising the circumscribed right; (3) whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and (4) whether alternatives exist that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. Id. at 89-91.

The first factor requires consideration of whether the restrictions on the plaintiff's religious rights bear a valid and rational connection to a legitimate and neutral objective. Under this prong, courts accord great deference to the judgment of prison officials, who are charged with the "formidable task" of running a prison. Sutton v. Rasheed, 323 F.3d 236, 253 (3d Cir. 2003) (quoting O'Lone, 482 U.S. at 353). The first factor is "foremost" in the Court's

28

analysis, in that a rational connection is a "threshold requirement." Id. (quoting Wolf v. Ashcroft, 297 F.3d 305, 310 (3d Cir. 2002)). The second factor requires consideration of whether inmates have alternative means of exercising the constitutional right at issue. In the free exercise context, the Court considers whether the inmate has other means of practicing his religion generally, not whether he has other means of engaging in any particular practice. Sutton, 323 F.3d at 255 (quoting DeHart, 227 F.3d at 55). The third and fourth Turner factors focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources. Sutton, 323 F.3d at 257 (quoting DeHart, 227 F.3d at 57).

As extensively discussed *supra*, there can be no question that DC-819 is rationally related to DOC's legitimate interest in running DOC facilities safely and efficiently. That is, DC-819 is reasonably related to DOC's concerns that non-generic services and individual group accommodations will undermine DOC's ability to run a complex prison housing a very large transitory inmate population. Further accommodations—in particular, separate congregate services for MTOI and NOI inmates—would significantly affect DOC's ability to provide the current level of mandated services to its inmate

population. Moreover, if this Court were to find that the DOC must provide separate congregate services for NOI inmates, little, if anything, would preclude numerous other faith groups from seeking their own separate congregate services. The First Amendment surely does not require such an outcome. Also, as explained above, Plaintiff has adequate opportunity to pray and conduct religious rituals in his cell, correspond with and have priests, ministers or religious advisors visit him at the prison, possess religious books and materials, and other devotional items. There is simply nothing to lead this Court to conclude that Marshall's ability to practice his faith was restricted or that he was prohibited from practicing his religion in any manner.

As such, the Court need not reach the remaining issue of the absence of ready alternatives. Therefore, defendants are entitled to an entry of summary judgment on this claim.

### D. **Establishment Clause**

Plaintiff alleges that the DOC's policy regarding religious services violates the First Amendment's Establishment Clause by "establishing the Sunni Islam sect as the PDOC's favored Islamic group to be followed over Plaintiff's, preventing Plaintiff from observing separate NOI religious services,

while allowing separate Christian religious services, and by compelling NOI and Sunni Islam groups to merge and observe combined Islamic services contrary to Plaintiff's religious beliefs, while not compelling the four Christian groups to do the same." (Doc. 7, complaint).

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion ." U.S. Const. amend. I. The Supreme Court has set forth three tests for determining whether governmental action violates the Establishment Clause: the coercion test, the Lemon test, and the endorsement test. Mondrovich v. Allegheny Cnty., 385 F.3d 397, 400–01 (3d Cir.2004). The first of these, the "coercion" test, is not applicable to this case because it focuses primarily on government action in public education. See Freiler v. Tangipahoa Parish Bd. of Educ., 185 F.3d 337, 343 (5th Cir.1999), cert. denied, 530 U.S. 1251, 120 S.Ct. 2706, 147 L.Ed.2d 974 (2000). The second test, named after the Supreme Court case, Lemon v. Kurtzman, 403 U.S. 602, (1971), is a three-prong approach that finds a challenged action unconstitutional if (1) it lacks a secular purpose, (2) its primary effect either advances or inhibits religion, or (3) it fosters an excessive entanglement of government with religion. Lemon, 403 U.S. at 612–13. Finally, the "endorsement" test modifies Lemon in cases involving

31

religious displays on government property, which is not applicable here. Thus, of the three tests, the only one with any possible application to this case is Lemon. Indeed, it appears that Plaintiff is relying on the second approach of this test in arguing, in essence, that the primary effect of the implementation of DC–ADM 819 is to inhibit his Islamic Religion. This claim, however, is without merit.

As previously discussed, DC-ADM 819 does not inhibit or interfere with any of Plaintiff's required religious practices, but merely places a restriction on providing separate MTOI services, as well as other secular services, due to budget and security considerations. However, such secular services restriction is not made without a reasonable accommodation of providing worships services for major faith groups, which represent the whole body of a particular faith group, such as Catholics, Jehovah's Witnesses, Jewish, Muslim, Native American and Protestants, without impermissibly promoting any specific religion. Thus the denial of separate services clearly falls short of fostering or endorsing one religious practice over another.

Likewise, Plaintiff's argument that the denial of separate services "compels [him] to convert to, practice and follow the Sunni" religion, (Doc. 7, complaint), is equally without merit. Although Plaintiff wishes to worship

32

together with other MTOI or NOI members, he has not shown abandonment of a precept to receive a benefit. Moreover, although Plaintiff has been permitted and encouraged to worship with Orthodox Muslims, the record is devoid of any indication that Plaintiff has been compelled to "modify his religious behavior or beliefs." See Adkins v. Kaspar, 292 F.3d 559, 567, 569-570 n.37 (5th Cir. 2004), cert. denied, 545 U.S. 1104 (2005)(holding that a governmental action or regulation creates a substantial burden on religious exercise if it truly pressures the offender to significantly modify his religious behavior and greatly violates his religious beliefs). Thus the Court finds no support in the record for a violation of the Establishment Clause, nor any evidence to show government compulsion of religion, and summary judgment on these issues will be entered in favor the Defendants.

### E.    Equal Protection Clause

The Equal Protection Clause guarantees all citizens "equal protection of the laws,"meaning that similarly situated people must be treated the same. U.S. Const. amend. XIV. Generally, prison officials cannot discriminate against inmates of different religions. Cruz v. Beto, 405 U.S. 319 (1972) (per curiam). When an inmate asserts an equal protection claim based on the

allegedly disparate treatment of different religious groups, the governing standard is whether the disparate treatment is " 'reasonably related to legitimate penological interests.' " DeHart v. Horn, 227 F.3d 47, 61 (3d Cir. 2000). Marshall must therefore show that he was similarly situated to, and treated differently than, other inmates requesting separate religious services, and such disparate treatment was not reasonably related to legitimate penological interests.

DC–ADM 819 establishes that any inmate with concerns regarding accommodations of any particular faith group must follow the procedures set forth in that policy, which include completing a religious accommodation request form. Initially, the Court notes that Plaintiff's religious accommodation request was conducted in accordance with DC-ADM 819 and there is no record evidence to demonstrate that this review deviated from that applied to other inmates seeking the same religious accommodation. Plaintiff's affiliation with a particular faith group was not the reason for the denial of his request. Rather, the denial was based on available space, resources and security concerns. Moreover, it is undisputed that Plaintiff was able to pray or conduct religious rituals in his cell, correspond with and have priests, ministers or religious advisors visit him at the prison, possess religious books and

34

materials, and other devotional items that are consistent with prison security policies. Thus, Marshall has failed to provide any competent summary judgment evidence that MTOI or NOI adherents are treated any differently than similarly situated faiths. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (stating that the Equal Protection clause does not require that all persons be treated alike, but rather that "all persons similarly situated should be treated alike.") Accordingly, summary judgment will be granted in favor of Defendants with respect to Plaintiff's Equal Protection claim.

## V.    Conclusion

Based on the foregoing, Defendant's motion for summary judgment will be granted and judgment will be entered in favor of Defendants and against Plaintiff. Based on the Court's resolution of the parties' cross motions for summary judgment, *supra*, Plaintiff's motion for enlargement of time to file dispositive motions, motion to take videotape depositions, and motion for an order to file a sur-reply, will be dismissed as moot. Plaintiff's motion to compel will be denied, as Defendants have responded to all of Plaintiff's discovery requests. (See Doc. 112, Defendants' brief in opposition to Plaintiff's motion

to compel). Plaintiff's motion for leave to file an amended complaint will be

denied for the reasons set forth in this Court's January 22, 2014

Memorandum and Order.

An appropriate order will follow.

s/ *Malachy E. Mannion*

**MALACHY E. MANNION**
**United States District Judge**

**Date: March 17, 2015**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-0351-06.wpd

36